IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**Philadelphia Indemnity Insurance Company,**

        Plaintiff,

v.

**Megalomedia, Inc.,** *et al.*,

        Defendants.

**Civil Action No. 4:20-cv-01644**

## <u>DEFENDANTS' FIRST AMENDED COUNTERCLAIM</u>

Defendants and Counterclaimants Megalomedia, Inc. ("Megalomedia"), Megalomedia Studios, LLC, Mansfield Films, LLC ("Mansfield Films"), and DBA Holdings, LLC (collectively, "Defendants")[1] file this First Amended Counterclaim.[2]

1.      Defendants counterclaim against Plaintiff Philadelphia Indemnity Insurance Company ("Philadelphia" or the "Insurer") for recovery of the premiums Defendants paid, damage to Defendants' business reputation, Defendants' costs of defense, indemnity of the settlements and claims Defendants paid, other consequential damages, attorneys' fees, and pre- and post-judgment interest.

---

[1] Defendant Megalomedia LLC does not exist.

[2] Defendants previously asserted causes of action for (i) declaratory judgment, (ii) breach of contract, (iii) violation of Texas Insurance Code Chapter 542, (iv) breach of the duty of good faith and fair dealing, and (v) certain alleged violations of Texas Insurance Code 541. Those claims have been deemed dismissed based on the Court's Order entered June 1, 2021 (ECF No. 32) and have been removed from this First Amended Counterclaim in light of that ruling.

**A.    Parties, Jurisdiction and Venue**

2.    The Insurer, Philadelphia, is subject to the jurisdiction and venue of this Court by virtue of having brought this action.

3.    Megalomedia, Inc. is a Texas corporation doing business in the state of Texas with its principal place of business in Travis County, Texas.

4.    Mansfield Films, LLC is a Texas limited liability company doing business in the state of Texas with its principal place of business in Travis County, Texas.

5.    Megalomedia Studios, LLC is a Texas limited liability company doing business in the state of Texas with its principal place of business in Travis County, Texas.

6.    DBA Holdings, LLC is a Texas limited liability company doing business in the state of Texas with its principal place of business in Travis County, Texas.

**B.    General Allegations**

<u>**Introduction**</u>

7.    Philadelphia is an insurance company that purported to provide commercial property insurance, commercial general liability insurance, commercial inland marine insurance, commercial automobile insurance, and commercial umbrella liability insurance to Megalomedia. Philadelphia is part of the Tokio Marine Group, a Japanese insurance conglomerate that is one of the largest insurance companies in the world, with a market capitalization of $34.7 billion.

8.    Megalomedia is a television production company based in Austin, Texas. Megalomedia produces popular reality-TV documentary series like My 600-Lb Life, Quints by Surprise, and Shipping Wars.

2

9.      For years, Philadelphia represented to Megalomedia that it provided coverage for reality-TV documentary series like My 600-Lb Life.  And for years, Megalomedia paid premiums for its insurance policies with Philadelphia.

10.     In 2020, after Megalomedia was sued by former and current participants in My 600-Lb Life, Megalomedia promptly notified Philadelphia of the lawsuits and requested that Philadelphia defend and indemnify Megalomedia and Defendants for those associated claims.

11.     Philadelphia refused to provide coverage, and now claims that it *never* provided coverage for any of Megalomedia's productions, notwithstanding its earlier representations to Megalomedia.

12.     Philadelphia's representations that it would cover Megalomedia's reality-TV documentary series induced Megalomedia to obtain insurance coverage from Philadelphia.  Philadelphia's false representations also violate Texas insurance law.  Because Megalomedia has suffered damages as a result of Philadelphia's misrepresentations and omissions, as detailed below, Defendants bring these counterclaims.

### *Philadelphia, Lacking Experience in the Entertainment Industry, Lands the Megalomedia Account*

13.     When Philadelphia first entered into an insurance contract with Megalomedia in late 2010, Philadelphia was just starting to build a book of film production business. In fact, the Megalomedia account was the very first film production policy for Philadelphia's Austin office.

14.     To win and then maintain the Megalomedia account, Philadelphia made representations and undertook a pattern of conduct that led Megalomedia to believe that it could obtain— and was obtaining—tailored but comprehensive coverage for its television productions.  Now it has been revealed those representations were false.

3

### *Megalomedia Submits, and Philadelphia Approves, Productions for Coverage*

15.    In 2010, as part of Philadelphia's process of writing the first policy issued to Megalomedia, Philadelphia required Megalomedia to fill out and submit a Philadelphia application form called the "Film Production Supplemental Application." The Film Production Supplemental Application requests general information about the applicant's film production business, as well as information about the various types of insurance coverage sought. As to general liability coverage, the Film Production Supplemental Application asks for the "name and description of production(s) for which coverage is requested."

16.    In the Film Production Supplemental Application that Megalomedia submitted to Philadelphia to obtain insurance in 2010, Megalomedia listed the productions "Heavy" and "Quintuplets by Surprise," among others, as the productions for which Megalomedia was requesting commercial general liability coverage.

17.    Philadelphia approved the application and entered into an insurance contract with Megalomedia. Megalomedia paid the premium. Before "binding" the policy—that is, confirming that coverage was in place--Philadelphia never told Megalomedia or Megalomedia's broker that it could not, or would not, cover "Heavy," "Quintuplets by Surprise," or the other listed productions.

### *The Only Megalomedia Productions that Philadelphia Rejects are Cop Shows*

18.    The only shows for which Philadelphia explicitly denied coverage involved filming law enforcement officers. Again, Philadelphia never explicitly denied coverage for My 600-Lb Life until Megalomedia was sued in Houston state court.

19.    In May 2011, during the first year of Megalomedia's coverage under the new policy it purchased from Philadelphia, Megalomedia, through its broker, contacted Philadelphia

4

about getting coverage for a new production called Cartel City. Megalomedia sent a standalone Film Production Supplemental Application just for Cartel City seeking commercial general liability ("CGL") coverage. Megalomedia described Cartel City in the Film Production Supplemental Application as a documentary following the "day-to-day life of the LaJoya Police Department." Don Stalnaker, Philadelphia's sales representative in charge of the Megalomedia account, sent Megalomedia's request on to Philadelphia's underwriting department, requesting that the production be added.

20.    The next month, on June 3, 2011, a Philadelphia underwriter in an internal email to the sales representative rejected Cartel City from Philadelphia's insurance coverage decision. The underwriter said that Cartel City "sound[ed] like 'cops' and more like a reality show th[a]n a documentary[.] We cannot add and will add an exclusion for reality shows to the CG2153."

21.    Philadelphia, in an email from account executive Melissa Relf, then represented to Megalomedia that Cartel City was different from the other shows that Megalomedia was producing: "We had underwriting review the info for this new project and their response was it sounds more like a reality show **than a documentary** so we are not going to be able to add it to the policy."

22.    After being informed of the rejection of Cartel City, Megalomedia's broker protested that Cartel City was a documentary and asked underwriting to reconsider. But Philadelphia, desperate to keep Megalomedia's account, made promises that Philadelphia would provide coverage to Megalomedia's other shows, including other reality-TV documentaries. The Philadelphia sales representative, Don Stalnaker, told Megalomedia's broker that he "went back to Underwriting to get a better explanation of why we won't consider this **one**." Stalnaker told Megalomedia that the danger associated with the show was too problematic for Philadelphia.

5

But, critically, Stalnaker assured Megalomedia's broker that Philadelphia was **"okay with the other work that they are doing, just not this particular project."**

23.     This was not the only time that Philadelphia took actions or made representations to keep Megalomedia's account when it was at risk of losing it.

24.     At the time of 2011 renewal, the circulated policies included "reality show" exclusion language. Philadelphia had actually jammed this language into the policies in a mid-term change, outside of the normal renewal period.

25.     At the time of renewal, Megalomedia, through its insurance agent, asked Philadelphia to confirm that its productions would indeed continue to be covered in light of the new language. An internal Philadelphia email reported that Megalomedia was "concerned b/c **they do produce documentary type shows which we knew about then we first wrote this policy**."

26.     As Philadelphia required, Megalomedia provided Philadelphia with lists and descriptions of upcoming projects, so that Philadelphia could make sure that the projects were "acceptable" to Philadelphia and "fit into [Philadelphia's] guidelines." Megalomedia's submitted list and descriptions included "Quints by Surprise Season 4," "Shipping Wars," "Fugitive Recovery," and other shows in "development."

27.     Philadelphia, in an email from account executive Melissa Relf, stated that if a show was on the "supp[lemental application] last year . . . it has been included on the new and renewal policies," such as was the case with the new season of Quints by Surprise.

28.     As part of procuring and renewing the Policies and coverage, Megalomedia, through its insurance agent, continually informed Philadelphia of its productions. As Philadelphia required them, Megalomedia submitted Film Production Supplemental Applications to Philadelphia that listed Megalomedia's productions for which it sought coverage. Megalomedia pro-

vided descriptions of its productions when requested. For productions sought to be added mid-term, Megalomedia directly informed Philadelphia of the upcoming productions and requested coverage.

29.    At the end of 2012, as part of that upcoming renewal, Megalomedia submitted a Film Production Supplemental Application to Philadelphia that included "My 600 Lb Life, Season 2" and "Shipping Wars, Season 2." Megalomedia also submitted paragraph-long descriptions of the shows that summarized Shipping Wars as "documents the daily lives of independent transporters hauling shipments out on the road. . . ," and summarized My 600-Lb Life as "documents the weight-loss journey of five individuals. . . ."

30.    Philadelphia again approved the application and entered into an insurance contract with Megalomedia.  Megalomedia, in turn, paid the premiums. Before "binding" the policy, Philadelphia never told Megalomedia or Megalomedia's broker that it could not, or would not, cover "Shipping Wars Season 2" or "My 600 Lb Life Season 2." Philadelphia never told Megalomedia or its broker that Philadelphia considered either show to be a reality show.

31.    In 2013, Philadelphia rejected another Megalomedia cop show called Fugitive Recovery, which involved riding with US marshals.  In rejecting that law enforcement production, Philadelphia again cited only "the element of danger associated with their job," and again stated that the show was "**much different th[a]n [t]he prior shows <u>such as</u>** 'Heavy' 'Half ton teen' 'Half ton mom' 'Tx Car wars' 'Quints by surprise.'" Those other "prior" shows are all reality TV documentary series like My 600-Lb Life.

32.    Philadelphia's requests for Film Production Supplemental Applications and/or production descriptions, Philadelphia's statements and indications that it was reviewing the submitted materials, and doing so in accordance with guidelines, Philadelphia's express rejections of

7

only certain law-enforcement productions on a piecemeal basis, Philadelphia's assurances that it was covering productions and that it was OK with Megalomedia's other productions, and Philadelphia's representations about why certain shows were not acceptable under the Policies, led Megalomedia to believe many things. They led Megalomedia to believe that Philadelphia was actually reviewing the materials Megalomedia submitted and determining whether the productions were acceptable, and doing so pursuant to some non-arbitrary process. They led Megalomedia to believe that unless Philadelphia expressly rejected a production Megalomedia had submitted for coverage, that production had been determined to be acceptable and was being covered. They led Megalomedia to believe that if Philadelphia accepted a production when Megalomedia procured or renewed the policy, that Philadelphia's underwriters or claims department could not later reverse that determination, such as when Megalomedia had a claim relating to the production. And most importantly, they led Megalomedia to believe that its key productions would be covered.  What Philadelphia led Megalomedia to believe turned out to be false.

### *Philadelphia Never Tells Megalomedia That Key Productions Would Not Be Covered*

33.    Philadelphia's omissions also led Megalomedia to falsely believe that it was getting the commercial general liability coverage it wanted and was paying for. A senior account executive for Philadelphia testified in this lawsuit: "If we didn't cover one [a production], the agent would have submitted it and **we would have told them we weren't**." But Philadelphia never told Megalomedia it was not providing commercial general liability coverage for key productions. For example, Philadelphia never told Megalomedia it was not providing coverage for productions such as Heavy, My 600-Lb Life, or Quintuplets By Surprise.

34.    And Philadelphia certainly never told Megalomedia it was not providing commercial general liability coverage for any of Megalomedia's productions.

35.     Had Megalomedia's received a rejection of a key production—or had Megalomedia been informed that none of its productions were covered—Megalomedia would not have paid Philadelphia for commercial general liability coverage.  Megalomedia would have obtained the commercial general liability coverage it had thought it was obtaining from Philadelphia from a different insurance carrier. This includes both standalone and additional coverage. And Megalomedia would have had coverage for the Underlying Litigation, as described below.

### *After Megalomedia Is Hit With Litigation and Files a Claim, Philadelphia Tells Megalomedia that its Productions Were Never Covered*

36.     On February 10, 2020, David Bolton, an individual who had been filmed for the show My 600-Lb Life, brought a lawsuit against Defendants.  Mr. Bolton alleged causes of action for negligence, intentional infliction of emotional distress, and promissory estoppel.

37.     Megalomedia promptly notified Philadelphia of the lawsuit and requested that Philadelphia defend and indemnify Megalomedia and Defendants for the claims of Mr. Bolton.

38.     From January to April of 2020, several other former participants who were represented by the same law firm as Mr. Bolton, brought similar lawsuits against Defendants.  The plaintiffs included the following individuals: Karen Sue Bonner, James Bonner, Sr., and Tera Ann Shumaker, as personal representative of the Estate of James "L.B." Bonner, Jr.; Jeanne Covey and Barbara J. Fallaw; Alicia Kirgan; Gina Krasley; Nicole Lewis; Dorothy Perkins; Maja Radanovic; Matthew Ventress a/k/a Destinee Lashaee; and Annjeanette Whaley (collectively with Mr. Bolton, the "Underlying Plaintiffs").

39.     All of the claims and lawsuits brought by the Underlying Plaintiffs (individually, collectively, and as consolidated, the "Underlying Claims" in the "Underlying Litigation") were ultimately consolidated into the case styled *Karen Sue Bonner, James Bonner, Sr., Tera Ann Shumaker, as Personal Representative of the Estate of James "L.B." Bonner, Jr. v. Megalomedia*

*Inc., Megalomedia LLC, Mansfield Films, LLC, and DBA Holdings, LLC*, Cause No. 2020-03939, pending in the 55th Judicial District Court in Harris County, Texas.

40.     As they were filed, Megalomedia promptly notified Philadelphia of each of the lawsuits and requested that Philadelphia defend and indemnify Megalomedia and Defendants for the claims.

41.     A Philadelphia claims adjuster first reviewed the Bolton claim after Megalomedia submitted it, and originally "confirmed that there is Coverage for this loss." But that claims adjuster was required to bring the claim to her supervisor, because the Underlying Litigation seeks millions of dollars.

42.     After seeking to speak with her supervisor, the Philadelphia claims adjuster suddenly reversed her determination that there was coverage, and the claim was taken off her desk and reassigned to another adjuster.

43.     Philadelphia ultimately denied coverage as to all of the claims in the Underlying Litigation.

44.     Defendants obtained their own attorneys to represent their interests in the Underlying Litigation brought by the Underlying Plaintiffs.

### *Philadelphia Now Denies that it Ever Provided Coverage for ANY of Megalomedia's Productions*

45.     Discovery has revealed that, despite its earlier representations to Megalomedia, Philadelphia actually never provided general liability coverage for *any* of Megalomedia's productions. Philadelphia denies that it ever provided coverage for My 600-Lb Life, Half Ton Teen, Half Ton Dad, Half Ton Mom, Texas Car Wars, Shipping Wars, Quints by Surprise, or any of Megalomedia's other productions. When requested to admit that it provided general liability

coverage for just *some* of Megalomedia's productions, Philadelphia repeatedly "denied" that it had ever provided coverage:

**REQUEST FOR ADMISSION NO. 9:**
Admit that Philadelphia provided commercial general liability coverage under the Primary Policies for some of Megalomedia's Listed Productions.

**RESPONSE:** Philadelphia can neither admit nor deny Request No. 9 because the definition of "Listed Productions" includes Megalomedia-produced shows that are not relevant to this Lawsuit. To the extent a response is required, denied.

**REQUEST FOR ADMISSION NO. 11:**
Admit that Philadelphia provided commercial general liability coverage under the Primary Policies for some of Megalomedia's Productions.

**RESPONSE:** Deny.

46.    Philadelphia's stunning statement that it did not provide coverage for any of Megalomedia's productions begs the question: What type of insurance coverage exactly was Megalomedia paying Philadelphia for?  The answer is now clear that Philadelphia repeatedly promised to provide coverage for Megalomedia's productions to induce Megalomedia to pay annual premiums, and as soon as a claim arose, Philadelphia changed its tune and disclaimed coverage.

***Philadelphia Did Not Review Megalomedia's Film Production Supplemental Applications or Make the Determinations It Promised It Would***

47.    Discovery has also revealed that Philadelphia did not actually have any standardized methodology or guidelines in place for reviewing Megalomedia's productions as it had led Megalomedia to believe.

48.    There is no documentation evidencing that Philadelphia undertook the review of the productions at all, as it has promised, for certain submission years.

49.    Philadelphia has no list setting forth which of Megalomedia's productions Philadelphia determined were acceptable for coverage.

11

50.     Philadelphia led Megalomedia to believe that its acceptable-for-coverage deter-minations would be based on a reasoned determination by Philadelphia of whether each produc-tion was more like a documentary vs. a reality show, with a guideline for that review being whether there was a heavy element of boots-on-the-ground danger, like that in "Cops-like" shows. But in reality, Philadelphia has no document defining either of those terms. The Policies do not, and have never, defined the term "reality show." Nor do the Policies define "documen-tary." The Policies do not, and have never, identified which Megalomedia productions are "reali-ty shows." Philadelphia has no written guidelines or other documents that define the term "reali-ty show" or "documentary" or set forth other guidelines for making such a classification. Despite having pivotal roles in reviewing the Megalomedia account, neither a Philadelphia claims adjust-er nor the Philadelphia account executive who was responsible for the Megalomedia account could define those terms, and had no idea what key Megalomedia productions were even about.

51.     In light of the lack of any policies or procedures defining reality show or docu-mentary, Philadelphia's decision to deny coverage was arbitrary and capricious.

52.     It is also clear that while Philadelphia promised coverage to Megalomedia's pro-ductions, Philadelphia now denies that it provided coverage at all. Philadelphia's promise of coverage was an illusion, and Philadelphia was content to receive significant annual premiums from Megalomedia while it maintained that illusion.

## C.     First Cause of Action – Fraudulent Inducement

53.     Defendants incorporate the allegations contained in paragraphs 1 to 52 as if fully incorporated herein.

54.     Discovery has confirmed that, on multiple occasions, Philadelphia represented to Megalomedia that the insurance policies Megalomedia procured from Philadelphia from 2010 to

12

2020 would cover Megalomedia's productions, or provide tailored coverage of Megalomedia's key productions.

55.    Philadelphia now asserts that the polices it issued never covered those productions at all, including key productions such as Heavy, My 600-Lb Life, and Quintuplets by Surprise.

56.    Philadelphia bases its noncoverage assertion on an exclusion for designated ongoing operations in the Primary Policies that includes language that "[e]xcludes any/all reality shows." Discovery revealed that this language was not included in the original Policy procured in 2010, but that Philadelphia added this language into the Policies as a mid-term change.

57.    The Policies do not, and have never, defined the term "reality show."  The Policies do not, and have never, identified which Megalomedia productions are "reality shows."

58.    Philadelphia has no written guidelines or other documents that define the term "reality show."

59.    At no point in time until the Underlying Litigation was filed did Philadelphia explicitly advise Megalomedia that it considered My 600-Lb Life a "reality show" or that it was not providing coverage for My 600-Lb Life.  In fact, Philadelphia previously represented that it had approved other reality-TV documentaries similar to My 600-Lb Life, like for example, Heavy.

60.    Megalomedia listed My 600-Lb Life on the Film Production Supplemental Applications as and when requested by Philadelphia, and Megalomedia advised Philadelphia that My 600-Lb Life was a "documentary," assuming that Philadelphia would provide coverage as Philadelphia had done for other documentary shows Megalomedia produced. Philadelphia never told Megalomedia or Megalomedia's insurance broker that it would not cover My 600-Lb Life, that Philadelphia considered My 600-Lb Life to be "reality show" as that term is used in the designated ongoing operations exclusion, or that My 600-Lb Life did not fall within Philadelphia's

13

underwriting guidelines. Only after the Underlying Litigation arose did Philadelphia tell Mega-

lomedia that My 600-Lb Life was not covered under the Policies. Philadelphia deceived Mega-

lomedia into believing Philadelphia was providing coverage for My 600-Lb Life.

61.    Philadelphia's representations concerning the Policies, which types of productions

the Policies covered, how the reality TV exclusion affected—and did not affect—coverage of

Megalomedia's productions, and Philadelphia's assurances that the Policies covered Megalome-

dia's productions other than those that Philadelphia specifically rejected after review, were false

and constitute material misrepresentations. Philadelphia's failure to advise Megalomedia that it

did not cover My 600-Lb Life was a material omission. Philadelphia's failure to advise Megalo-

media that it did not cover any of Megalomedia's productions was a material omission. Philadel-

phia's representations that productions were covered were material misrepresentations. When

Philadelphia made these misrepresentations or omissions, it either knew they were false, or reck-

lessly asserted these misrepresentations without any knowledge of their truth. Philadelphia made

these misrepresentations and omissions with the intent that they be acted on by Megalomedia, so

that Philadelphia would get and keep Megalomedia's large business account (and the significant

premiums associated with that account), which Philadelphia was at risk of losing if Megalome-

dia's major productions like My 600-Lb Life were not covered.

62.    Megalomedia reasonably and justifiably relied on Philadelphia's misrepresenta-

tions as to which productions the Policies covered and did not cover, and Megalomedia contin-

ued to purchase insurance from Philadelphia based on those misrepresentations.

63.    As a direct and proximate result of Philadelphia's misrepresentations, Defendants

suffered damages, including but not limited to compensatory damages including but not limited

to (1) the premiums paid to Philadelphia; (2) incidental and consequential damages which oc-

curred due Philadelphia's misrepresentations, including damages to Megalomedia' business reputation and increases in premiums for coverage from other insurers; (3) the reasonable and necessary expenses Defendants have incurred, and now continue to incur, in defending against the Underlying Litigation; (4) any judgment against Defendants in favor of the Underlying Plaintiffs; (5) any settlement amount paid by Defendants in the resolution of the Underlying Litigation, in whole or in part.

**D.      Second Cause of Action – Deceptive Insurance Practices in Violation of Texas Insurance Code, Chapter 541, Subchapter B**

64.     Defendants incorporate the allegations contained in paragraphs 1 to 63 as if fully set forth herein.

65.     Megalomedia and Philadelphia are both "persons," as that term is defined in Chapter 541 of the Texas Insurance Code (Deceptive Insurance Practices).

66.     Philadelphia's above-described acts and practices constitute numerous violations of Texas Insurance Code, Chapter 541, subchapter B including the following violations: (1) making statements misrepresenting the terms of the Policies, Tex. Ins. Code § 541.051(1)(A); (2) making statements misrepresenting the benefits or advantages promised by the Policies, *id.* § 541.051(1)(B); (3) using names and titles for the Policies that misrepresent the true nature of the Policies, *id.* § 541.051(4); (4) using names and titles of for the Policies' class that misrepresents the true nature of the class of the Policies, *id.* § 541.051(4); (5) making misrepresentations to Megalomedia for the purpose of inducing, or that tended to induce, Megalomedia to allow its existing policy to lapse or the forfeit or surrender the policy, *id.* § 541.051(5); (6) misrepresenting the Policies by making untrue statements of material fact, *id.* § 541.061(1); (7) misrepresenting the Policies by failing to state material facts necessary to make other statements made not misleading, considering the circumstances under which the statements were made, *id.* §

541.061(2); and (8) misrepresenting the Policies by making statements in a manner that would mislead a reasonably prudent person to false conclusions of material facts.

67.    Philadelphia misrepresented the terms, benefits, and advantages of the Policies, and misrepresented key facts. Philadelphia misrepresented that the Policies provided commercial general liability coverage for Megalomedia's key productions, when Philadelphia now denies that it ever provided such coverage for any of Megalomedia's productions. Philadelphia further misrepresented that documentary style productions would be covered. Philadelphia misrepresented that the terms of the reality-show exclusion and the effect it would have on coverage. Philadelphia misrepresented that if Megalomedia submitted productions for evaluation as to whether they were acceptable for coverage, that Philadelphia would undertake the evaluation and further, that the evaluation would be done pursuant to guidelines. Philadelphia misrepresented that it would honor its original determinations and representations that productions were acceptable and covered.

68.    Philadelphia used terminology like "film production" and "general liability" coverage to title and refer to their Policies, even though the true nature of the Policies was not to provide that type of coverage.

69.    Philadelphia referred to the Policies as being in an "entertainment package" for Megalomedia's entertainment business and productions, even though the true nature of the Policies was not to provide that type of coverage.

70.    Philadelphia got Megalomedia's business by convincing Megalomedia to leave its former insurance carrier rather than renewing. Philadelphia misrepresented to Megalomedia that it would provide Megalomedia with general liability coverage for its productions, which tended to induce Megalomedia to obtain coverage from Philadelphia.

16

71.    Philadelphia further misrepresented the Policies by failing to state material facts necessary to make other statements made not misleading, considering the circumstances under which the statements were made. Philadelphia failed to tell Megalomedia that Philadelphia would not necessarily review the materials Megalomedia submitted and that Philadelphia would not necessarily determine whether the productions were acceptable. Philadelphia did not tell Megalomedia that Philadelphia actually had no written guidelines or systematic process for making acceptable-for-coverage determinations, or determinations as to whether a production was a reality show or a documentary. Philadelphia did not tell Megalomedia that Philadelphia would reject productions Megalomedia had submitted for coverage without ever expressly informing Megalomedia of that decision. Philadelphia did not tell Megalomedia that if Philadelphia accepted a production when Megalomedia procured or renewed its policy, that Philadelphia's underwriters or claims department could later reverse that determination, such as when Megalomedia had a claim relating to the production. Philadelphia did not tell Megalomedia that its key productions would not be covered.  Philadelphia did not tell Megalomedia that it would not be providing tailored or comprehensive general liability coverage to Megalomedia. When Philadelphia requested Film Production Supplemental Applications, budgets, synopses or other information or documents from Megalomedia, Philadelphia failed to inform Megalomedia of key facts related to the purpose of the collection of the documents or information, how Philadelphia would use or evaluate the documents or information, and how the documents or information would affect production coverage.

72.    Philadelphia's pattern of conduct and manner of statements and omissions from 2010 and 2020 in dealing with the Megalomedia accounts misrepresented the Policies because

17

this was done in a manner that would mislead a reasonably prudent person to false conclusions of material facts, as it led Megalomedia.

73.     As a direct and proximate result of Philadelphia's deceptive acts and misrepresentations, Defendants suffered damages, including but not limited to compensatory damages including but not limited to (1) the premiums paid to Philadelphia; (2) incidental and consequential damages which occurred due Philadelphia's misrepresentations, including damages to Megalomedia' business reputation and increases in premiums for coverage from other insurers; (3) the reasonable and necessary expenses Defendants have incurred, and now continue to incur, in defending against the Underlying Litigation; (4) any judgment against Defendants in favor of the Underlying Plaintiffs; (5) any settlement amount paid by Defendants in the resolution of the Underlying Litigation, in whole or in part. The damages suffered by Defendants include independent injuries apart from the policy benefits.

74.     Philadelphia's pattern of deceptive conduct, its deceptive acts, its misrepresentations, and its material omissions were extreme acts that caused injury to Defendants.

75.     Further, Philadelphia acted knowingly in when it engaged in these deceptive acts and misrepresentations.

**E.    Third Cause of Action – Deceptive Insurance Practices in Violation of Texas Insurance Code, Chapter 541, Though Violation of Texas Business & Commerce Code § 17.46(b)**

76.     Defendants incorporate the allegations contained in paragraphs 1 to 75 as if fully set forth herein.

77.     Megalomedia and Philadelphia are both "persons," as that term is defined in Chapter 541 of the Texas Insurance Code (Deceptive Insurance Practices).

78.     Philadelphia's above-described acts and practices constitute numerous violations of Texas Business & Commerce Code § 17.46(b) including the following violations: (1) repre-

senting that Philadelphia's insurance services had characteristics, uses, and benefits which it did not have, Tex. Bus. & Comm. Code § 17.46(b)(5); (2) representing that the Policies had characteristics, uses, and benefits which they did not have, *id.* § 17.46(b)(5); (3) advertising Philadelphia's Policies and insurance services with an intent not to sell them as advertised, *id.* § 17.46(b)(9); (4) making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions, *id.* §17.46(b)(11); (5) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, *id.* § 17.46(b)(12); (6) misrepresenting the authority of a salesman, representative or agent to negotiate the final terms of a consumer transaction, *id.* § 17.46(b)(14); and (7) failing to disclose information concerning the Policies and Philadelphia's services which was known at the time of the transaction, and such failure to disclose such information was intended to induce Megalomedia into a transaction into which Megalomedia would not have entered had the information been disclosed, *id.* § 17.46(b)(24).

79.    Philadelphia represented that its insurance services included entertainment package, film production, and general liability coverage, and that Philadelphia would provide such coverage for Megalomedia's productions. Philadelphia represented that it could provide tailored coverage for Megalomedia's productions with a production-by-production evaluation that could be competently undertaken by Philadelphia. Philadelphia did not actually have these services.

80.    Philadelphia represented that the Policies provided general liability coverage for Megalomedia's productions, and Megalomedia's key productions. Philadelphia now denies that any such coverage was provided for any production.

81.    Philadelphia obtained and kept Megalomedia's business by advertising that its insurance services and Policies included the services and coverages outlined above, but Philadelphia did not intend to actually sell such services or Policies to Megalomedia as advertised.

82.    Philadelphia misled Megalomedia as to the basis for price reductions in premiums, when the real basis was that Philadelphia was not providing the robust coverage for Megalomedia's productions that Megalomedia thought it was.

83.    Philadelphia represented that the Policy agreements conferred or involved rights concerning coverage that they did not have. Philadelphia represented that its acceptable-for-coverage determinations conferred or involved rights concerning coverage that they did not have.

84.    Philadelphia misrepresented that Philadelphia sales representatives, account executives, and underwriters could evaluate Megalomedia's productions and make a final determination as to whether they would be covered when Megalomedia procured, supplemented, and renewed its Policies, as Philadelphia reversed those decisions years later after claims arose.

85.    Philadelphia failed to disclose information concerning its insurance services and the Policies which was known at the time. Philadelphia failed to disclose that it planned to add a reality show exclusion as a mid-term change, even though that information was already known to Philadelphia when it rejected Cartel City. Philadelphia failed to tell Megalomedia the true extent and implications of the reality show exclusion. Philadelphia failed to tell Megalomedia that Philadelphia would not necessarily review the materials Megalomedia submitted and that Philadelphia would not necessarily determine whether the productions were acceptable. Philadelphia did not tell Megalomedia that Philadelphia actually had no written guidelines or systematic process for making acceptable-for-coverage determinations, or determinations as to whether a production was a reality show or a documentary. Philadelphia did not tell Megalomedia that Philadelphia

would reject productions Megalomedia had submitted for coverage without ever expressly informing Megalomedia of that decision. Philadelphia did not tell Megalomedia that if Philadelphia accepted a production when Megalomedia procured or renewed the policy, that Philadelphia's underwriters or claims department could later reverse that determination, such as when Megalomedia had a claim relating to the production. Philadelphia did not tell Megalomedia that its key productions would not be covered.  Philadelphia did not tell Megalomedia that it would not be providing tailored or comprehensive general liability coverage to Megalomedia. When Philadelphia requested Film Production Supplemental Applications, budgets, synopses or other information or documents from Megalomedia, Philadelphia failed to inform Megalomedia of key facts related to the purpose of the collection of the documents or information, how Philadelphia would use or evaluate the documents or information, and how the documents or information would affect production coverage. Philadelphia's failure to disclose this information was intended to induce Megalomedia into buying, keeping, and renewing the Policies with Philadelphia, but Megalomedia would not have obtained insurance from Philadelphia had the information been disclosed.

86.    Megalomedia relied on Philadelphia's acts and practices to its detriment.

87.    As a direct and proximate result of Philadelphia's deceptive acts and misrepresentations, Defendants suffered damages, including but not limited to compensatory damages including but not limited to (1) the premiums paid to Philadelphia; (2) incidental and consequential damages which occurred due Philadelphia's misrepresentations, including damages to Megalomedia' business reputation and increases in premiums for coverage from other insurers; (3) the reasonable and necessary expenses Defendants have incurred, and now continue to incur, in defending against the Underlying Litigation; (4) any judgment against Defendants in favor of the

Underlying Plaintiffs; (5) any settlement amount paid by Defendants in the resolution of the Underlying Litigation, in whole or in part. The damages suffered by Defendants include independent injuries apart from the policy benefits.

88.    Philadelphia's pattern of deceptive conduct, its deceptive acts, its misrepresentations, and its material omissions were extreme acts that caused injury to Defendants.

89.    Further, Philadelphia acted knowingly in when it engaged in these deceptive acts and misrepresentations.

**F.    Fourth Cause of Action – Attorneys' Fees**

90.    Defendants incorporate the allegations contained in paragraphs 1 to 89 as if fully set forth herein.

91.    Due to the actions of Philadelphia, Defendants have been forced to retain the services of the law firm of Scott, Douglass & McConnico, L.L.P.  Defendants have agreed to pay a reasonable fee for the attorneys' services necessary to be rendered in this action. Pursuant to Chapter 541 of the Texas Insurance Code (Deceptive Insurance Practices). Defendants are entitled to an award of their reasonable attorneys' fees in an amount to be established at trial.

## V.    PRAYER

WHEREFORE, Defendants request that Defendants' request for relief be granted, and that a judgment be entered against the Insurer and in favor of Defendants such that:

1.    judgment for Defendants against the Insurer for all damages Defendants have suffered as a result of the Insurer's fraudulent inducement and as a result of the Insurer's deceptive insurance practices;

2.    judgment that Defendants are entitled to recover their costs and expenses, including attorneys' fees incurred in this action;

3.    judgment awarding Defendants their costs and pre-judgment and post-judgment interest in the maximum as allowed by law;

4811-2183-7553

4.      judgment that Defendants are entitled to recover statutory and additional damages against Philadelphia in the maximum as allowed by law; and

5.      such other and further relief as this Court deems just and proper.

Dated: July 14, 2021

Respectfully submitted,

SCOTT DOUGLASS & McCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300 Telephone
(512) 495-6399 Facsimile

By      _/S/ Santosh Aravind_
      Stephen E. McConnico–Attorney-in-Charge
      Texas Bar No. 13450300
      Southern District Bar No. 2879
      smcconnico@scottdoug.com
      Santosh Aravind
      Texas Bar No. 24095052
      Southern District Bar No. 2887372
      saravind@scottdoug.com
      Stephanie Kover
      Texas Bar No. 24102042
      Southern District Bar No. 3101605
      skover@scottdoug.com

*Attorneys for Defendants Megalomedia, Inc., Megalomedia Studios, LLC, Mansfield Films, LLC, and DBA Holdings, LLC*

23

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was electronically filed with the clerk of the court using the CM/ECF system and that it was served on Plaintiff on the 14th day of July, 2021.

Stephen A. Melendi
Matthew Rigney
TOLLEFSON BRADLEY MITCHELL & MELENDI, LLP
2811 McKinney Avenue, Ste. 250
Dallas, Texas  75204


*/s/ Santosh Aravind*
Santosh Aravind

24